# EXHIBIT 3

1

```
 1              IN THE UNITED STATES DISTRICT COURT.
                FOR THE DISTRICT  OF NEW JERSEY
 2              Civil No. 00-02931 (JCL)

 3

 4      WARNER-LAMBERT COMPANY
                                          Transcript of
                                          Proceedings
 5           V.

 6      PUREPAC PHARMACEUTICAL COMPANY,

 7
        - - - - - - - - - - - - - - - - - - - - - -
 8                                   Newark, New Jersey
                                     September 24, 2004
 9

10      B E F O R E:   HONORABLE JOHN C. LIFLAND,
                       UNITED STATES DISTRICT JUDGE
11
                A P P E A R A N C E S:
12

13      DRINKER, BIDDLE & REATH
        BY:  JOHN J. FRANCIS, JR., ESQ.
14              AND
        FITZPATRICK, CELLA, HARPER & SCINTO
15      BY:  HUGH C. BARRETT, ESQ.
        AND:  ROBERT L. BAECHTOLD, ESQ.
16      For Pfizer and Warner-Lambert.

17              FOR THE DEFENDANTS:

18      LITE, DE PALMA, GREENBERG & RIVAS
        BY:  ALLYN Z. LITE, ESQ.
19              AND
        KENYON & KENYON
20      BY:  THOMAS J. MELORO, ESQ.
        AND:  STEVEN J. LEE, ESQ.
21      For Teva Pharmaceuticals, Generic Defendants.

22      - - - - - - - - - - - - - - - - - - - - - -
                LYNNE JOHNSON, CSR, CM, CRR
23              OFFICIAL COURT REPORTER
                UNITED STATES DISTRICT COURT
24              P.O. BOX 6822
                LAWRENCEVILLE, NEW JERSEY  08648
25              PHONE:  973-645-2513
```

```
 1              SAIBER, SCHLESINGER, SATZ & GOLDSTEIN
                BY:  ARNOLD B. CALMANN, ESQ.
 2                        AND
                FROMMER, LAWRENCE & HAUG
 3              BY:  EDGAR H. HAUG, ESQ.
                AND:  STEVEN M. AMUNDSON, ESQ.
 4              AND:  TERRI-LEE YOUNG, ESQ.
                FOR Purepac Pharmaceutical Co. And Faulding, Inc.
 5
                SCHIFF HARDIN
 6              BY:  JOHN C. MARTIN, ESQ. (IL BAR)
                For Geneva.
 7
                MATHEWS, COLLINS, SHEPHERD & MC KAY
 8              BY:  ROBERT G. SHEPHERD, ESQ.
                For Ranbaxy.
 9
                ST. ONGE, STEWARD, JOHNSTON & REENS
10              BY:  RICHARD J. BASILE, ESQ.
                        AND
11              DONALD HOROWITZ, ESQ.
                For Eon Labs.
12
                NORRIS, MC LAUGHLIN & MARCUS
13              BY:  JOSEPH J. FLEISCHMAN, ESQ.
                        AND
14              RAKOCZY, MOLINO & MAZZOCHI
                BY:  WILLIAM A. RAKOCZY, ESQ.
15              FOR Defendant Apotex.

16              LERNER, DAVID, LITTENBERG, KRUMHOLZ & MENTLIK
                BY:  WILLIAM L. MENTLIK, ESQ.
17              AND:  RUSSELL W. FAEGENBURG, ESQ.
                For Defendant Ivax.
18
                COHEN, PONTANI, LIEBERMAN & PAVANE
19              BY:  JULIA S. KIM, ESQ.

20         -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -
                Pursuant to Section 753 Title 28 United States
21         Code,the following transcript is certified to be an accurate
           record as taken stenographically in the above-entitled
22         proceedings.

23
                LYNNE JOHNSON, CSR, CM
24              Official Court Reporter

25
```

3

1          THE COURT:  Welcome to the fifth floor.

2          A scheduling note.  A request was made yesterday

3    that we sit no later than two o'clock today for the

4    observances of some, and that is fine.  In fact, just five

5    minutes ago I found out that I have to break at 1:30 so I can

6    get to see a doctor.

7          So I hope that won't inconvenience anybody to break

8    a half an hour earlier than was requested.

9          I have set aside Monday for a continuation, if

10   necessary.  And we will see.

11         The motion for a preliminary injunction as made by

12   Warner-Lambert is based upon the information it has received

13   as to an impending launch of Purepac's formulation, which

14   Warner-Lambert feels violates the '482 patent.

15         I have received extensive briefing from both sides.

16   There has not been time for the normal three steps of

17   briefing in situations like this.  And accordingly, I am

18   going to ask Warner-Lambert to speak to the subject of best

19   mode which was -- to which Purepac has devoted 22 pages in

20   its brief.  I think that is, that makes sense to me.

21         We will see where that takes us.

22         Before anybody says anything, there have been

23   inquiries as to whether the courtroom should be closed for

24   some part of the proceedings.

25         I asked Mr. Basilone to reach out to counsel and

1    get their views on that.  My understanding is counsels'

2    response has been "maybe."  Perhaps I should pursue that

3    first before I pursue anything else.

4            Who wants to speak on that?  Mr. Francis.

5            MR. FRANCIS:  Warner-Lambert would just as soon it

6    is open.  We have no objection one way or the other.

7            MR. HAUG:  Good morning.  Ed Haug for the defendant

8    Purepac.

9            If I can, on behalf of Teva, they can speak for

10   themselves, we don't have a problem with it being open until

11   we get to the financial evidence in the case.  We prefer it

12   that way which I suspect will come off through the

13   irreparable harm discussion and there is a hole host of

14   highly proprietary confidential financial information and

15   contractual dealings that have all been filed under seal.

16   And we would very much like not to have to disclose those

17   publicly.

18           The suggestion I think I had made yesterday to the

19   clerk is that perhaps we, one way of possibly dealing with

20   that, your Honor, is maybe we could have one section of the

21   hearing that might be -- where we could seal the courtroom in

22   some way, just that portion if we get into that.

23           THE COURT:  All right.  You are talking about

24   Purepac's financial information?

25           MR. HAUG:  Correct, your Honor.

1      THE COURT:  I am sorry to be distracted here.  I am

2  looking for the document that was just handed to me five

3  minutes ago from Mr. Lite.  It is here some place.  I haven't

4  had a chance to read it.

5      MR. LITE:  Mr. Basilone, here is an extra copy.

6      THE COURT:  Thank you, Mr. Lite.

7      (Pause).

8      THE COURT:  All right.  I have reviewed the

9  declaration of John W. Blank, III, submitted by Mr. Lite.

10     MR. LITE:  Your Honor, if I may, that is being

11  filed under seal as well, and however the Court chooses to

12  treat Purepac's financial information, we would ask that on

13  behalf of Teva that this information be treated the same way.

14     If your Honor would close the courtroom, we

15  certainly think that that would be appropriate.  If your

16  Honor thinks that maybe something other than closing the

17  courtroom, or at least outside counsel, we could be heard at

18  sidebar when these issues come up, I think that might be

19  appropriate, however your Honor wishes.

20     THE COURT:  I will certainly hear counsel before I

21  close the courtroom.

22     The plaintiff has express a view that the courtroom

23  not be closed for any part of these proceedings.  My

24  preliminary observation about Mr. Blanke's declaration is

25  that he talks about what he heard at a sales meeting,

6

 1   essentially a convention.  And that is a little different

 2   than Purepac's financial information.

 3              MR. LITE:  Your Honor, the other part that Mr.

 4   Blanke's declaration that talks about the intentions of Teva,

 5   in light of what happened, in light of what Mr. Blanke has

 6   said in his declaration, about Teva's intentions, depending

 7   on what happens at the hearing today, is information that I

 8   would like, if possible the Court would keep under seal until

 9   such time as a determination is made by the Court that it can

10   be made public.

11              THE COURT:  All right.  I have indicated what I

12   would like to hear about first.  I can see that I am going to

13   be provided with a Power Point presentation by somebody.

14   Does that relate to best mode?

15              MR. HAUG:  Not from my point, your Honor, no.

16              THE COURT:  Okay.  Then save some electricity if

17   you want.  Turn it off.  Or whatever you would like is fine

18   with me.  Okay.

19              All right.  Who wants to speak for Warner-Lambert

20   in response to the best mode presentation that came with

21   Purepac's proof?

22              MR. BARRETT:  Your Honor, Mr. Barrett from

23   Fitzpatrick, Cella.  I will speak to that issue.  The Power

24   Point presentation is not mine, so I don't know how to turn

25   it off.

1          THE COURT:  Somebody has got to confess to it.

2          Talk from the lectern, please, to help the

3    reporter.

4          Are the microphones at the desks working well?  If

5    so, I don't have any objection to speaking from the desk, if

6    you cut off to the microphone.  But the final arbiter of that

7    is going to be the reporter.

8          (Off-the-record discussion).

9          THE COURT:  Just to set the stage, if it needs to

10   be set.  At pages 15 to 37 of its brief, within the overall

11   ambit of its presentation on success on the merits, Purepac

12   argues that there is a substantial question of validity based

13   upon the failure to disclose the best mode, the

14   specification.

15         I would ask Mr. Barrett on behalf of Warner-Lambert

16   to respond to that.  That was not part of our discussion a

17   month ago with respect to Ivax's launch.

18         MR. BARRETT:  Actually, your Honor, as I understand

19   the brief, it goes all the way up to page 42.  And I must

20   say, it came as much of a shock to Warner-Lambert to find

21   that their opposition brief was devoted to this subject, as I

22   am sure it has come to the Court, because the Court hasn't

23   heard about this subject before.

24         It has not been the subject of a summary judgment

25   motion.  It has not specifically been raised by Purepac as a

1    defense except to mention some aspects of it in one or more

2    of their expert reports.  And I am sure that it is here

3    because Purepac's believes that the more they say here the

4    more they are going to make the entire issue of this

5    preliminary injunction difficult to deal with at this time.

6         There is another 30 pages the Court has to get

7    through and find that we show no substantial merit to their

8    defense.

9         But like most of Purepac's other defenses, your

10   Honor, and with all respect to Purepac, there is as much

11   smoke and mirrors in this best mode defense as there is in

12   their chloride claim construction defense or their chloride

13   noninfringement defense, or their adjuvant titanium oxide

14   defense.  They all follow the same mold, which is, your

15   Honor, it is a mold that is, that lends itself to smoke and

16   mirrors because of a chemical nature of this case.  Chemistry

17   can be very confusing.  The nomenclature itself is

18   incomprehensible.  So it is easy to go around and make all of

19   these arguments and then to expect your Honor to try to

20   figure them out is a formidable expectation.

21        Let me tell your Honor a little bit about best

22   mode.  I don't know if it is a patent issue that you have

23   dealt with in prior cases.  It is another one of these

24   so-called Section 112 defenses.  It is not a validity defense

25   based on prior art.  It is a validity defense based on the

1  patentee's failure to put into the specifics of the patent

2  the things that he has meant to include there to deserve the

3  awarding of this grant of the exclusivity on the invention

4  for the period of time that a patent runs.

5       You know about Section 112 defenses because Purepac

6  has raised two other validity attacks.  Purepac has not

7  raised, as we mentioned, any validity attacks based upon

8  prior art which is the standard of validity attack on a

9  patent.  They have raised two Section 112 validity attacks in

10  their summary judgment motions.

11       As I said before, and I will say it again, although

12  Mr. Mentlick disagreed with me, Section 112 invalidity

13  attacks are not favored.  They are very technical.  There are

14  not many cases where a patent has been held to be invalid for

15  one reason or another based on Section 112.  But it is a

16  requirement of the patent statute that the patent entity has

17  to include certain things in its specification.

18       As you know from the other motion, and defenses

19  that they have raised before, he needs to meet, he needs to

20  provide a written description of his invention.  She needs to

21  be sure that his specification is not, and the description of

22  the invention is not so indefinite that one skilled in the

23  art is not able to ascertain the scope of the claims.

24       But the third requirement from Section 112, the

25  best mode, is perhaps the one that is most misunderstood, and

1   the one that is perhaps the most difficult to get a grip on

2   in some cases.  But certainly not in this case, as I will

3   show your Honor.

4            I do want to point out to you that there, as I

5   understand it, there have only been in the history of the

6   Federal Circuit, in the 20 years now of the Federal Circuit,

7   they have only held seven patents invalid on the basis of

8   best mode defense.  It is not, and there have been many,

9   many, many more attacks on the patent for best mode defense.

10  But there has only been seven, and these seven cases where

11  best modes have been used as a method to invalidate the

12  patent are all set out in the case that Purepac cites in the

13  case, this Beyer case, which Beyer did end up finding there

14  was no best mode violation even in that case.

15           But they are all set out in there, your Honor could

16  take a look at that and look at the unique circumstances.  It

17  certainly is a defense that requires a very factual

18  case-by-case basis, no general principles that are really

19  defining, except that the idea is that the inventor needs to

20  put into his invention the so-called best mode.

21           What does that mean?  That means that the inventor

22  cannot hide the ball from the public once the patent issues.

23  For example, if he develops a process for making a chemical,

24  and he claims that process, and that is the invention.  And

25  it has several steps.  But he discovered in his laboratory

1    that in step three of that process, that step three really

2    only worked if he put in this magic extra chemical, he put in

3    some extra gobbledygook and then claimed that process really

4    worked, really worked.  But he doesn't mention that in his

5    patent.  He just mentions, "Run step three."  And then when

6    people skilled in the art try to follow the steps of the

7    patent they have a problem getting through the process

8    because step three doesn't work very well and they have to go

9    through all kinds of experimentation at which time they may

10   or may not find that particular secret ingredient he threw in

11   to make the process work.

12           That is something that the patent law frowns on.

13   You don't want to hide the ball in terms of specifically what

14   you are claiming is your invention.  That is where the best

15   mode defense, the best mode requirement has come from.  And

16   it certainly does make sense.  It makes sense that certain

17   inventions, it is important to be sure that those critical

18   elements that make it necessary, that are necessary -- that

19   are necessary for practicing the invention are disclosed in

20   the patent.  Absolutely something Warner-Lambert agrees with

21   100 percent.  But that is certainly not the case here.  It is

22   not the case, and it is very difficult to get through these

23   30 pages of the brief and try to figure out why it is not the

24   case.

25           By I ask the Court as I go through this very

12

1  quickly just to keep in mind one thing, and that is that the

2  basic attack that we are having on the patent on the best

3  mode defense, on their best mode defense, is that -- let me

4  go back a step.

5         As your Honor is probably aware by this point in

6  time, our claim has two aspects to it.  There is the chloride

7  aspect and there is this adjuvant aspect.  And the adjuvant

8  aspect relates to the fact that certain adjuvants which are

9  these ingredients you put into the drug before you can mix

10 them into a tablet or capsule, you can't just put the

11 straight drug in there.  It doesn't work that way.  You have

12 to mix it with a filler or something.

13        These ingredients unpredictably have an effect on

14 the lifetime formation.  It is not something Warner-Lambert

15 expected.  They discovered to make a reasonable formulation

16 you needed to be aware of this problem.  You needed to be

17 aware certain excipients might be more of a problem in

18 forming lactam than other ones.  If you weren't aware of that

19 and you made a formulation and tested one and found it was

20 unstable lactam formation over a short period of time you

21 wouldn't know where to look for the solution to the problem.

22 You wouldn't know whether, of course if you didn't have the

23 '482 patent in front of you, you wouldn't know it was a

24 hydrochloric acid content.  You wouldn't know the excipients

25 were causing the problem.  That is not to say it is not a

13

1  standard skill in the art to realize that certain excipients

2  are better than others in drug formulations.  That was none.

3        But in this case, this unpredictability of which

4  excipients can really have some major effect on lactate

5  formation wasn't known.  The patent, the teaching and

6  invention that is embodied in this section of the '482

7  patent, the adjuvant portion, is that it is teaching someone

8  skilled in the art how to make a proper Gabapentin

9  formulation, how to take one or more of the millions of

10  excipients, potential excipients that are out there to put in

11  a drug and how to pick and choose the ones that work best for

12  your formulation, what your company wants to do, what kind of

13  problem they want to make, how big they want to make it, what

14  kinds of machines they have, do they need more of this

15  excipient for lubrication on their capsule-filling machine or

16  they need more filler because they are using this capsule.

17        Every formulation is different, but the idea is

18  this patent teaches you how to make a formulation that is

19  stable by looking at the excipients and realizing that

20  certain excipients have a greater effect, negative effect on

21  lactam formulation than others and taking that into account

22  and possibly -- not possibly, but probably, tinkering with

23  the formulation, changing amounts of excipients, changing

24  excipients to come up with a formulation that satisfies your

25  need for a product that is stable enough to file with the

14

1   FDA, that is basically  what I would  believe is a teaching

2   of what that adjuvant portion of the claim is getting to.

3        Now, why do I talk about that in connection with

4   best mode?  Because what defendants say is that in the course

5   of making their invention, the Warner-Lambert scientist in

6   Godecke Germany developed two, a formulation that they called

7   their preferred formulation, their so-called market image

8   formulation.  And that this preferred formulation is the one

9   that Warner-Lambert knew worked.  I guess the assumption, or

10  the inference is that other formulations didn't work.  But

11  this formulation worked.  And it contained these three

12  mysterious ingredients, corn starch, lactose and talc.

13        And we knew this, we knew this, and we didn't tell

14  the public in our invention, in power patent, we wanted to

15  hide the real formulation that worked.  This so-called image

16  formulation, and they demonstrate that it was the formulation

17  that was developed originally at Godecke early on and that

18  that formulation carried through in its formulation that

19  Warner-Lambert is using in its capsule product today.  And

20  that is true.

21        What defendants don't say is that -- One more

22  thing.  What defendants suggest is that no other formulation

23  works.  And you got to know this formulation.  And if you

24  didn't have the teaching in the patent, how would you know

25  what formulation would work.  And you would have to go

1   through incredible experimentation to come up with this

2   formulation, and that in fact, all the ANDAs have been filed,

3   everybody uses the same three components, lactose, corn

4   starch, and talc formulation.

5          The real facts are so far from that, your Honor.

6   First of all, the preferred formulation that they referred to

7   that Warner-Lambert selected was the one that Warner-Lambert

8   decided fit their needs.  It fit their bill.  First of all,

9   as Dr. Gebhart, one of the inventors, he was the inventor on

10  the formulation side, testified in deposition, Purepac hasn't

11  included this in their brief, he testified that the reason

12  they started with corn starch, lactose and talc is because

13  those are three of the most common ingredients in drug

14  formulations today, at the time he developed the invention

15  and they were certainly  by far the most common ingredients

16  in drug  formulations being  developed at Godecke at that

17  time and they had tons of corn starch, lactose and talc in

18  their laboratory and a lot of experience with it so they

19  started with that one.   And sure enough, that worked.  That

20  worked.

21         It did not provide the kinds of instability that

22  some of the other formulations they did make using other

23  ingredients, such as magnesium stearate, tended to come some

24  lactam formation.  That is what our patent was about,

25  teaching people that certain ingredients have more of an

16

1    effect than others.

2            So it wasn't a secret, necessarily the only

3    formulation that worked.  It was the formulation we selected

4    because that worked, whether that worked with our experience,

5    our machines, our capsules, that is what worked, and that is

6    not to make my point short, that is not what the best mode is

7    about.  This was not a matter of we were hiding the best mode

8    of our invention.  This was just one formulation.

9            The suggestion that this is the only formulation

10   that works is just -- is ridiculous, your Honor.

11           First of all, even Purepac is forced to admit that

12   they started off using our three-component formulation.  You

13   asked how did they know how to use our three-component

14   formulation.

15           Well, I suggest that probably it was the most

16   common formulation in their laboratory also.  But they say

17   that the reason they knew to use that three-component

18   formulation was that they had read our label which came out

19   in 1994 when our drug came on the market.  This is the FDA

20   label.  In that FDA label that comes in your package of

21   Neurontin you have to list the ingredients in your product.

22   That label indeed lists lactose, corn starch and talc.  They

23   say that is how they knew to use those three ingredients and

24   thank God they had that advanced warning how to do it.  That

25   we failed to give them a patent.  Best mode.